Argued and submitted May 28, 2008, reversed and remanded April 1, 2009

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

BARRY LEE PARKER,
*Defendant-Appellant.*

Multnomah County Circuit Court
050834613; A131282

205 P3d 65

Shawn Wiley, Deputy Public Defender, argued the cause for appellant. With him on the briefs was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Janet A. Metcalf, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Brewer, Chief Judge, and Ortega, Judge, and Carson, Senior Judge.

ORTEGA, J.

## ORTEGA, J.

Defendant appeals a judgment of conviction for possession of a controlled substance, *former* ORS 475.992(4) (2003), *renumbered as* ORS 475.840(3) (2005). Defendant contends that the trial court erred by denying his motion to suppress evidence found in a search of his person that was conducted in connection with what he reasonably believed to be a warrant check regarding him. Because we agree that defendant was stopped in violation of Article I, section 9, of the Oregon Constitution at the time of the search, we reverse and remand.[1]

■　In reviewing the denial of a pretrial motion to suppress, we are bound by the trial court's findings of fact if there is constitutionally sufficient evidence in the record to support them. *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005). Consistently with that standard, we take the following facts from the record and the trial court's oral findings.

Two police officers, Frankus and Devlin, were in a marked patrol car just after midnight. They saw defendant walking through a store parking lot that was known to them for drug activity. While remaining in the patrol car, Frankus yelled out the window to defendant, and defendant stopped and turned to speak to Frankus. Neither the overhead lights nor the siren of the patrol car were activated, and the patrol car was not parked in such a way as to block defendant's path.

Frankus spoke with defendant in a conversational tone. In response to Frankus's questions, defendant stated that he was from The Dalles and was in Portland until the next day for a construction job. Intending to check for warrants, Frankus asked for defendant's name and date of birth, which defendant provided. Frankus did not obtain defendant's driver license or any other documents.

No one told defendant that he was being checked for warrants. It is, however, a typical police practice to run a

---

[1] In his second assignment of error, defendant argues that the trial court erred by denying his motion to exclude a crime laboratory report identifying as methamphetamine the substance found on defendant's person. Given our disposition of defendant's first assignment of error, we do not reach that issue.

name for warrants after getting a name and birth date. Accordingly, while Frankus spoke to defendant, Devlin was using the patrol car's computer, which is between the driver's and passenger's seats.

Defendant testified that, in previous encounters with police, officers had run his name and date of birth. When Frankus asked for that information, defendant "figured he's running my name for outstanding warrants and it was just, you know, normal practice." Defendant saw that Devlin was using the computer and, although he was unable to "say for sure exactly what [Devlin] was doing," defendant believed that Devlin was checking for warrants. Defendant elaborated that, "to all of my knowledge and dealings and watching TV, yes, he was running me for warrants."

On hearing defendant provide his name and birth date, Devlin checked defendant's information and alerted Frankus that defendant had prior arrests for drugs. Frankus then got out of the patrol car, approached defendant on foot, and asked if defendant "had any dope on him." After defendant said no, Frankus asked to search him for drugs. Defendant responded by asking Frankus "what he had done wrong and why [Frankus] was harassing him." Frankus told defendant "that he hadn't done anything wrong and that I was just simply doing my job and talking to people, as I'm expected to do."

Around that time, defendant asked if he was under arrest and was told he was not. He made no attempt to leave. Frankus again asked for consent to search defendant. Defendant said nothing but pulled several items from his pants pocket. When defendant did so, Frankus saw that the pocket contained a loaded syringe. Frankus then asked if he "could be sure that [defendant] had taken everything out of his pockets." In response, defendant put his hands in the air.

Frankus "pulled everything else out of [defendant's] pockets" and found what appeared to be a baggie of methamphetamine. After Frankus told Devlin about finding drugs on defendant, Devlin read defendant his *Miranda* rights. Defendant then told Devlin that "he had a needle and a bag of meth in his pocket."

Before trial, defendant moved to suppress the evidence found as a result of Frankus's search of his person. The trial court denied that motion.

On appeal, defendant contends that the trial court erred because he was stopped in violation of Article I, section 9, and the evidence at issue was obtained by exploiting that unlawful seizure. Defendant argues that he was seized when Frankus obtained his name and date of birth and "defendant was aware of the fact that the officers were conducting the records check." Under *Hall*, the police actions constituted a stop, defendant contends, because a reasonable person in his circumstances would not feel free to leave while the police conducted their investigation.

The state responds that asking for a person's name and date of birth to run a records check does not constitute a seizure. In the state's view, "[a]t most, *Hall* clarified that, even if identification is returned to a citizen, using information obtained from the identification to run a records check *in the citizen's presence* transforms an encounter into a stop." (Emphasis in original.) The state posits that, regardless of defendant's belief that a records check was occurring, Frankus's request for defendant's name and date of birth—without taking defendant's identification or indicating that a records check was being conducted—would not cause a reasonable person to believe that he was not free to leave.

We begin with principles concerning seizures of persons. Encounters between police officers and citizens fall into three general categories:

> "The first category, 'mere conversation' encounters, encompasses consensual interactions between police officers and citizens that require no justification and that do not implicate Article I, section 9. The second category, temporary restraints of a person's liberty for investigatory purposes—or 'stop[s]' under ORS 131.615(1) (1995)—constitutes a type of 'seizure' of a person under Article I, section 9, that must be justified by a reasonable suspicion of criminal activity. The third category, arrests, also constitutes a 'seizure' of a person under Article I, section 9, and must be justified by probable cause to believe that the person arrested has committed a crime."

*Hall*, 339 Or at 16-17 (citations omitted; brackets in *Hall*). Determining whether a person has been seized is a fact-specific inquiry that requires consideration of the totality of the circumstances. *State v. Holmes*, 311 Or 400, 408, 813 P2d 28 (1991).

■■     Under Article I, section 9, a person is seized "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances." *Holmes*, 311 Or at 409-10 (footnote omitted). In determining whether a police officer has seized a person, "[t]he pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a non-offensive contact if it had occurred between two ordinary citizens." *Id.* at 410 (citation omitted).

■     Here, the issue is whether defendant's belief that he was stopped was objectively reasonable.[2] We assess whether, under the totality of the circumstances, "a reasonable person in defendant's position could have believed that the officers significantly had restricted his liberty or freedom of movement." *State v. Toevs*, 327 Or 525, 536, 964 P2d 1007 (1998); *see also State v. Ashbaugh*, 225 Or App 16, 28, 200 P3d 149 (2008) ("[A] person who knows that he or she is being investigated by a police officer during an encounter could reasonably believe that, for that reason, his or her freedom of movement has been restrained."); *id.* at 32 (Brewer, C. J., concurring) ("Although the issue is not free from doubt, I take the Supreme Court at its word in *Toevs* that it is enough to satisfy the objective prong of the second *Holmes* category that

---

[2] The trial court denied defendant's motion to suppress without making specific factual findings concerning whether defendant subjectively believed that he was stopped. Below, the state argued in closing that defendant's "subjective belief is not reasonable under those circumstances," but it did not dispute defendant's testimony about his subjective belief. In this court, the state conceded at oral argument that defendant's testimony at trial supported a finding that defendant did not believe that he could leave. *See State v. Bretches*, 225 Or App 602, 605, 202 P3d 883 (2009) (not reaching the issue of subjective belief under similar circumstances).

a reasonable person in defendant's position *could*, in the pertinent circumstances, believe that the officers significantly had restricted her liberty." (Citation omitted.)).

When a person is aware of being the subject of a pending records check, it is reasonable for the person to believe that he is not free to go. In *Hall*, a police officer took the defendant's identification card, radioed for a warrant check, and then promptly returned the card. Concluding that the defendant had been stopped, the court explained:

> "Although the state insists to the contrary, we find it difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check. We further observe that, in this case, [the officer] did nothing to dispel what would have been an objectively reasonable belief that defendant was restrained from leaving until [the officer] had received the results of the warrant check."

339 Or at 19; *see also State v. Thompkin*, 341 Or 368, 378-79, 143 P3d 530 (2006) (where officers pulled over a car in which the defendant was a passenger, asked for her identification to conduct a warrant check, and questioned her while awaiting the results of that check, the defendant had been seized). Under *Hall*, "retention of identification is not necessary to effect a stop if the person is aware that the officer is investigating whether the person is the subject of any outstanding arrest warrants." *State v. Rider*, 216 Or App 308, 313, 172 P3d 274 (2007), *rev dismissed as improvidently allowed*, 345 Or 595 (2008). Thus, in *Rider*, the defendant was stopped when a police officer, within the defendant's hearing, asked another officer to conduct a warrant check. *Id*. at 314.

Police officers need not expressly inform a person that they are conducting a warrant check in order to effect a stop. For example, in *State v. Highley*, 219 Or App 100, 102-03, 180 P3d 1230 (2008), the defendant was a passenger in a vehicle that had been operated by a driver with a suspended license. While waiting for information about the driver, a police officer asked the defendant about his probationary status, requested identification, wrote down the identifying information, and then returned to the patrol car to run a check on the defendant. Rejecting the state's argument that

the defendant did not know that he was the subject of a records check, we concluded that a reasonable person in the defendant's circumstances "would believe that the officer wrote down the identifying information and then immediately returned to his car with that information in order to run some type of records check." *Id.* at 108. Accordingly, we concluded that the defendant had been stopped. *Id.* at 110; *see also State v. La France*, 219 Or App 548, 554-55, 184 P3d 1169 (2008) (concluding that, where a police officer radioed the defendant's identifying information to a dispatcher and then returned the identification card, "a reasonable person in defendant's circumstances would not have believed that he was free to leave until the officer completed his investigation").[3]

Here, likewise, we conclude that a reasonable person in defendant's circumstances could conclude that he was not free to leave. Although Frankus did not orally request a records check within earshot of defendant, as the officer did in *Rider*, or take written information to a patrol car, as the officer did in *La France*, the totality of the circumstances could suggest to a reasonable person that Frankus requested identifying information so that Devlin could check for warrants. Frankus requested not only defendant's name but also his date of birth—very specific identifying information, consistent with checking records. Unlike the officers in *Rider* and *La France*, Frankus had no need to take any further action to obtain a records check. Sitting next to Frankus in the patrol car, Devlin was able to hear when Frankus obtained identifying information and to run that information on the computer immediately, and defendant saw that Devlin was using the computer. Under the circumstances, with one officer obtaining specific identifying information and a second officer using the computer, a reasonable person could believe that he was the subject of a pending records check and was not free to leave.

Indeed, it would seem anomalous to conclude that a reasonable person could *not* believe that he was the subject of

---

[3] Petitions for review in *La France* and *Highley* are being held in abeyance pending a decision in *State v. Ayles*, 220 Or App 606, 188 P3d 378, *rev allowed*, 345 Or 460 (2008).

a warrant check under the circumstances. Frankus testified that he intended to run a warrant check when he asked for defendant's name and date of birth. Both Frankus and Devlin testified that running a warrant check is a normal police practice when a name and date of birth are available. And, in fact, Devlin was—as defendant believed—running that information through records.

Because defendant was stopped in violation of Article I, section 9, and nothing broke the causal connection between that stop and the subsequent discovery of the evidence at issue, the trial court erred by denying defendant's motion to suppress.

Reversed and remanded.