Submitted on remand from the Oregon Supreme Court March 22,
reversed and remanded April 20, 2011

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STACY QUINN RADTKE,
*Defendant-Appellant.*

Marion County Circuit Court
06C49184; A136543

255 P3d 543

Ryan O'Connor, Deputy Public Defender, argued the cause for appellant. On the brief were Peter Gartlan, Chief Defender, and Travis Eiva, Deputy Public Defender, Legal Services Division, Office of Public Defense Services.

Samuel A. Kubernick, Assistant Attorney General, argued the cause for respondent. With him on the brief were

Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Ortega, Presiding Judge, and Schuman, Judge, and Sercombe, Judge.

SCHUMAN, J.

## SCHUMAN, J.

■     This case is before us on remand from the Supreme Court for reconsideration in light of *State v. Ashbaugh*, 349 Or 297, 244 P3d 360 (2010). In our first opinion, we held that a police officer unlawfully stopped defendant if she believed that her freedom had been significantly impaired when, without suspicion that she was involved in criminal activity, the officer asked for and received her name and date of birth, wrote that information in a notebook, asked her if she was carrying anything illegal, and, when she said that she was not, asked for and received consent to search her. Defendant argued that she was stopped when the officer recorded her name and date of birth and, if not at that point, then—at the latest—when he asked for consent to search after her denial of carrying contraband. We concluded that, under the reasoning in our opinion in *State v. Ashbaugh*, 225 Or App 16, 200 P3d 149 (2008), *rev'd*, 349 Or 297, 244 P3d 360 (2010), defendant's freedom was impaired when the officer asked for consent to search. For that reason, we did not address her argument regarding the taking of her name and birth date. Our reasoning in *Ashbaugh* did not survive Supreme Court review. On remand, we must now address the question that we avoided earlier: Was defendant seized when the police officer asked for, received, and wrote down her name and date of birth? We conclude that, under the totality of the circumstances in this case, she was. We therefore reverse and remand.

As related in our earlier opinion, the facts are as follows:

"Marion County Sheriff's Deputy Hickam was on a drug saturation patrol in Salem when he saw a man riding a bicycle toward a restaurant. Hickam recognized the man and approached him in the restaurant parking lot. The man told Hickam that he had come to the restaurant to meet a 'lady friend' named Stacy. The man consented to a search. Hickam found methamphetamine in the man's backpack, whereupon he arrested him and put him in the back seat of the patrol car.

"Hickam was standing at the open back door of the patrol car and talking to the man when defendant rode her bicycle into the parking lot and approached the entrance to

the restaurant, approximately 20 feet from the patrol car. Hickam recognized her as 'Stacy,' the person whom the arrested man intended to meet. Hickam asked her, 'Hey, can I talk to you for a second?' and motioned with his hand for her to 'come over to talk.' He used a normal tone of voice and did not physically interfere with defendant or impede her movement. Defendant stopped her bicycle and 'kind of stood with her bicycle in her hands and looked back towards [Hickam] and said, "What's going on?"' She then 'kind of walked her bike to the front of [the] patrol vehicle.' Hickam walked up to meet defendant.

"Based on defendant's bloodshot, glassy eyes and dilated pupils, Hickam believed that she was under the influence of a stimulant. He did not, however, believe the influence of the stimulant was sufficient to justify a further investigation, nor did he believe that she had committed any other crime. Nonetheless, he asked defendant if 'she had an ID on her that [he] could take a look at.' Defendant told him her name and date of birth, which Hickam wrote down. He then asked defendant if she had 'any drugs, weapons, [or] anything illegal on her.' When defendant said that she did not, Hickam asked if he 'could check her person and pockets for any drugs.' Defendant replied, 'I don't want you touching me, but I will show you.' She began to show Hickam the contents of her pockets. In the process, she attempted to extract and conceal a plastic baggie containing a white substance. Hickam saw it and believed that it was methamphetamine. He then took defendant's wrist, and the baggie fell from her hand. Hickam arrested defendant. The substance was later determined to be methamphetamine."

*State v. Radtke*, 230 Or App 686, 688-89, 217 P3d 220 (2009), *vac'd and rem'd*, 349 Or 663 (2011).

In our opinion, we relied on *State v. Toevs*, 327 Or 525, 964 P2d 1007 (1998), for the proposition that a suspect is seized when "a reasonable person in [the] defendant's position *could* have believed" that she was not free to simply walk away from an encounter with a police officer. *Radtke*, 230 Or App at 690 (quoting *Toevs*, 327 Or at 536) (emphasis added). We also relied on the familiar definition of a "stop" from *State v. Holmes*, 311 Or 400, 813 P2d 28 (1991), where the court held that a person is stopped

> "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."

*Radtke*, 230 Or App at 690 (quoting *Holmes*, 311 Or at 409-10). In its *Ashbaugh* opinion, however, the Supreme Court disavowed *Toevs* as an "anomaly," 349 Or at 316 ("The use of the phrase *'could have believed'* * * * clearly is an anomaly."), and abandoned the subjective aspect of the *Holmes* definition of a "stop" as "unworkable," *id.* at 312 ("Quite simply, we think that at least one component of the *Holmes* definition is unworkable, and this court since *Holmes* has proceeded as if the unworkable component were not there."). In place of the old standards, the court held:

> "A 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution: (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred."

*Id.* at 316. Applying that standard, the court held that the defendant was not stopped. Allowing that "it is possible to restrict a person's liberty and freedom of movement" without physically restraining the person, the court held that neither the police officer's questions nor his manner or actions involved a "show of authority." *Id.* at 317. The officer's interaction with the defendant was " 'relaxed and nonconfrontational,' * * *. Moreover, the officers had returned defendant's identification to her * * *." *Id.*

We are now left to confront the question whether the fact that the officer asked for and obtained defendant's name and date of birth, then wrote that information in a notebook but did not "run" that information to determine whether there was some reason to detain her—when combined with other aspects of the situation—amounted to a stop as now defined, that is, whether a reasonable person under the totality of the circumstances would believe that her liberty or freedom of movement had been intentionally and significantly

restricted.[1] To clarify, our inquiry is not whether taking defendant's information was by itself a stop; it is whether that action, combined with the immediately subsequent questioning, was a stop.

■ In *Ashbaugh*, the Supreme Court emphasized that the crucial question in determining if a mere encounter has become a constitutionally significant seizure is whether, by word or deed, a law enforcement authority has manifested a " 'show of authority' " that restricts a person's " 'freedom of movement.' " *Id.* at 317 (quoting *State v. Rodgers/Kirkeby*, 347 Or 610, 622, 227 P3d 695 (2010)). In earlier cases, however, the court has also held that a reasonable person would perceive a limitation on his or her freedom if the person knew that he or she was the subject of a criminal investigation. *E.g.*, *State v. Thompkin*, 341 Or 368, 378-79, 143 P3d 530 (2006) ("[W]e find it doubtful that a reasonable person in defendant's position would think that he or she was free to leave at a time when that person was the investigatory subject of a pending warrant check and was being questioned about illegal activity."); *State v. Hall*, 339 Or 7, 19, 115 P3d 908 (2005) ("[W]e find it difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check."). *Ashbaugh* did not disavow *Hall* or *Thompkin*.[2] We conclude, therefore, that taking a person's identification for the purpose of checking on the person's status is one way in which a police officer can show authority that, in combination with other circumstances, can convey to

---

[1] The state acknowledges that the officer did not have reasonable suspicion of criminal activity and that, if the stop was unlawful, the inculpatory evidence should have been suppressed.

[2] It remains to be seen if the court's holdings in *Hall* and *Thompkin* regarding the effect of taking a person's license and running a check were "anomalous" or "unworkable." The Supreme Court has allowed review in *State v. Highley*, 219 Or App 100, 180 P3d 1230 (2008), in which the court describes the issue as follows: "Under what circumstances, if any, is an officer's request for identification and running a warrants check a seizure under Article I, section 9, of the Oregon Constitution, if the officer has not restrained the person in any other way?" Supreme Court Media Release, Mar 25, 2011, http://www.ojd.state.or.us/sca/WebMediaRel.nsf/Files / 03-25-11_Supreme_Court_Conference_Results_Media_Release.pdf / $File / 03-25-11_Supreme_Court_Conference_Results_Media_Release.pdf (last visited Apr 12, 2011).

the person whose identification has been obtained that he or she is not free to leave.

In *Thompkin* and *Hall*, the defendants knew that they were being subjected to a warrant check. *Thompkin*, 341 Or at 379; *Hall*, 339 Or at 19 ("The defendant was cognizant that [the officer] was investigating whether defendant was the subject of any outstanding warrants."). Here, neither the testimony of witnesses nor the record expressly addresses that fact. However, the record does disclose that, when asked if he did anything with the information that he received from defendant, Hickam responded, "Not at that point," and that he immediately proceeded to question her about drugs and weapons on her person "[a]s *she was giving me* her date of birth and name." A reasonable inference from that sequence of events is that Hickam took defendant's name and date of birth for the purpose of running a check on her and the reason that he had not done so in no way indicated that he was not going to—in other words, that the investigatory process had commenced and was ongoing up to the point of arrest. That inference is bolstered by several other circumstances. First, defendant observed that the person whom she was planning to meet was under arrest, in the "caged" back seat of a patrol car. Second, there were two officers present and both were armed and in uniform. Third, as noted, in addition to taking her information, Hickam also questioned defendant about illegal activity, albeit in a calm and nonconfrontational voice.

In the final analysis, the only significant difference between this case and *Ashbaugh* is that, in *Ashbaugh*, the officers took the defendant's identification, ran a warrant check, and returned the identification to her several minutes before beginning to question her; thus, while she was being questioned, the warrant check had ended and (according to the Supreme Court) a reasonable person in that situation would not have felt constrained. As the Supreme Court noted,

> "the officers had returned [the] defendant's identification to her and left her alone while completing the arrest and transportation of her husband. Thus, while it may have been that [the] defendant had been unlawfully detained by

police some minutes before and had watched a clear show of authority directed at her husband, *those circumstances had ended.*"

*Ashbaugh*, 349 Or at 317 (emphasis added). Thus, calm and nonconfrontational questioning about illegal activity is not alone sufficient to reasonably create the impression of authoritative restraint. We conclude that a reasonable person in defendant's position would have believed that an investigation began when Hickam took note of her name and date of birth; thus, she was not only being questioned about illegal activity, she was under the impression that the police had begun an investigation of her and had not given her any reason to believe that it had ended. Under *Hall* and *Thompkin*, those facts add up to a seizure. As the state concedes, the officers lacked reasonable suspicion, and "the record does not demonstrate any attenuation between any stop and the deputy's discovery of methamphetamine." We therefore hold that the court erred in denying defendant's motion to suppress.

Reversed and remanded.